08 CV 4075

JUDGE DANIELS

Counsel of Record:
Mark K. Schonfeld (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-0068 (William Finkel)
(212) 336-1320 (fax)



RECEIVED
MAY 01 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION, :
                                       :
                            Plaintiff, :    08 CV ___ (__)
                                       :
                    v.                 :
                                       :
INTERPUBLIC GROUP OF COMPANIES, INC. and :
MCCANN-ERICKSON WORLDWIDE, INC.         :    **COMPLAINT**
                                       :
                           Defendants. :

---

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the

following against defendants Interpublic Group of Companies, Inc. ("IPG") and McCann-

Erickson Worldwide, Inc. ("McCann") (collectively, the "Defendants"):

## SUMMARY

1.      This enforcement action primarily involves securities fraud at McCann, IPG's

largest subsidiary.

2.      IPG is a holding company that owns numerous advertising, marketing and

associated companies, including the advertising agency, McCann, which, in turn, owns hundreds

of regional and local operating agencies throughout the world.

3.     From August 2002 through September 2005, IPG issued numerous restatements that together totaled more than $600 million. The restatements corrected misstatements in IPG's financial statements that emanated from numerous substantive areas in a variety of geographic regions, and reflected conduct ranging from inaccurate books and records and lack of internal controls to fraud.

4.     Initially, in the Fall of 2002, IPG restated its financial results in an amount of $181 million for the period 1997 to 2002. The largest component of this restatement (approximately $101 million) was attributable generally to the fact that McCann failed to expense intercompany charges.

5.     Specifically, McCann's financial management, including McCann's Vice-Chairman, Finance and Operations and Chief Financial Officer ("CFO"), and the Chief Operating Officer ("COO") of the Europe-Middle East-Africa region ("EMEA"), failed to ensure McCann reconciled its intercompany accounts for at least six years. At times, McCann's financial management purposely delayed reconciling intercompany accounts because they knew a reconciliation would result in write-offs that would interfere with McCann's efforts to hit profit targets. Because McCann never fully reconciled its intercompany accounts and failed to expense properly intercompany charges, McCann's financial results were inaccurate. (By 2002, McCann's intercompany accounts were misstated by approximately $101 million.) As McCann's financial management knew, IPG then incorporated McCann's misstated financial results in IPG's consolidated financial statements.

6.     IPG's financial management negligently ignored indications McCann was improperly accounting for intercompany transactions. Accordingly, IPG negligently ignored the

risk that McCann's results were materially misstated, with the result that IPG's own financial results were materially misstated.

7.    IPG's financial reporting problems were not resolved in 2002. In September 2005, IPG again restated its pre-tax income for the years 2000 through 2003, and the nine months ended 2004, in the amount of $420 million. A large portion of this restatement was related to $199 million of improperly recognized revenue related to Agency Volume Bonifications ("AVBs") and other vendor discounts and credits that IPG took in violation of its contracts with certain of its clients. The remaining restated items stemmed from a variety of issues, including improperly recording revenues from businesses IPG had acquired prior to the closing date of those transactions, and improperly accounting for payments to owners of former businesses as goodwill instead of as a compensation cost.

8.    The 2005 restatement was necessary because there had been a substantial breakdown of internal controls at IPG, and its numerous subsidiaries, including McCann.

9.    IPG filed numerous Forms 10-K, Forms 10-Q, Forms 8-K, and registration statements that contained misrepresentations due to the intercompany issues, the AVB issues, and the various other issues that were reflected in the 2002 and 2005 restatements. For example, in its 2002 Form 10-K, IPG reported net income of $99.5 million. This figure, however, was improperly inflated by $82.8 million, and IPG's actual income, as reflected in the restatements, was only $16.7 million (a 496% overstatement).

10.    Through this conduct, IPG violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a)(2) and (3), and Sections 13(a) and 13(b)(2)(A) and (B) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78m(a) and

78m(b)(2)(A) and (B), and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder, 17 C.F.R.

§§240. 12b-20, 13a-1, 13a-11 and 13a-13.

11.     Through this conduct, McCann violated Section 17(a) of the Securities Act, 15

U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

thereunder, 17 C.F.R. §240.10b-5, and aided and abetted IPG's violations of Sections 13(a) and

13(b)(2)(A) and (B) of the Exchange Act, 15 U.S.C. §§ 78m(a) and 78m(b)(2)(A) and (B), and

Rules 12b-20, 13a-1, 13a-11 and 13a-13, 17 C.F.R. §§ 240.12b-20, 13a-1, 13a-11 and 13a-13.

### JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to authority conferred by Section

20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15

U.S.C. § 78u(d)(1).  The Commission is seeking permanent injunctive relief from IPG and

McCann. The Commission also seeks disgorgement from IPG and McCann.  The Commission

seeks civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and

Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), against McCann.  Finally, the

Commission seeks all other just and appropriate relief.

13.     This Court has subject matter jurisdiction over this action pursuant to Section

22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. §

78aa.

14.     Venue lies in this court pursuant to Section 22(a) of the Securities Act, 15 U.S.C.

§ 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Certain of the transactions,

acts, practices and courses of business occurred within the Southern District of New York.  For

example, IPG's and McCann's headquarters are located in New York, New York.

4

15.    IPG and McCann, directly and indirectly, singly and in concert, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

## THE DEFENDANTS

16.    **IPG** is an advertising and media holding company that owns over 600 advertising agencies and other companies in approximately 130 countries. IPG is headquartered in New York, New York, and its stock is listed on the New York Stock Exchange.

17.    **McCann** is a Delaware corporation that IPG wholly owns. McCann maintains its headquarters in New York. McCann's revenues during the relevant period constituted approximately one-third to over one-half of IPG's revenues. McCann is organized into regional groups: North America, EMEA, Asia Pacific and Latin America. In terms of number of operating agencies, EMEA was McCann's largest region with 193 operating agencies in 40 countries. McCann grew dramatically between 1996 and 2001, including acquiring over 100 companies. McCann Advertising, Ltd. ("MEA"), McCann's advertising agency in London, was one of EMEA's largest agencies.

## OTHER RELEVANT PARTIES

18.    **PricewaterhouseCoopers, LLP** ("PwC US") served as the global auditing firm to IPG throughout the relevant period. PricewaterhouseCoopers' UK affiliate ("PwC UK") served as the external auditor for EMEA's headquarters and MEA.

## FACTS

### Background

**IPG's Corporate Culture**

19.     IPG and McCann had a deep-rooted culture that emphasized profits as the company's prime objective.

20.     MEA's Finance Director from 1997 through early 2000 described the drive to deliver profits as very aggressive.

21.     Every year from 1997 through 2001, PwC UK listed "pressure from parent company to produce results in line with budget" as one of several risk assessments at MEA, McCann's advertising agency in London, in PwC's internal audit strategy memorandum.

22.     Every fall, McCann conducted "Forward Planning Meetings." At these meetings, McCann management met with regional management and local heads of agencies and proposed budgets and profit targets for the following year. McCann management then either accepted or rejected the budget. If rejected, the agencies had to return with a higher number to attain. After McCann management accepted the budget for all of its agencies, McCann management then submitted the budget on a consolidated basis to IPG management, who then either accepted or rejected it.

23.     This planning process was updated twice throughout the year -- in the Spring and Summer -- based on actual profits achieved by the agencies and any other developments. During the updating process, new profit targets were set, often above the original target set in the Forward Planning Meeting. Consequently, these targets were called "stretch targets."

6

24.    IPG also had a process of setting budgets and profit targets for its operating agencies, such as McCann.

25.    Every Fall, management of each operating agency, including McCann, would submit its proposed consolidated budget and profit target to IPG. IPG management would then either accept the proposed budget or reject it. This process was updated twice throughout the year.

26.    IPG, too, insisted on aggressive profit targets. Failure to meet profit targets could result in lower bonuses for officers and employees, and potentially termination.

27.    IPG's and McCann's focus on profits, and lack of adequate attention to balance sheet issues, as well as their inadequate internal controls and books and records, contributed to IPG's and McCann's intercompany problems, as well as a myriad of other financial reporting problems.

### The 2002 Restatements – The Intercompany Problems

Intercompany **Transactions**

28.    McCann utilized intercompany accounts to record and account for activity conducted between its hundreds of agencies.

29.    When handled properly, intercompany transactions would be booked through a corresponding entry by each side of a given transaction, and would have no impact on McCann's consolidated assets, liabilities, expenses or revenues.

30.    Imbalances occurred, however, for a variety of reasons, including instances where there was a delay in processing of the invoice, or the McCann agency being charged (or its client) disputed the amount of the charge.

7

31.    In some cases, rather than record an expense, local agencies placed offsetting debits designated as "in dispute" or "in transit" in various suspense accounts on the balance sheets, including an account called "AR-Other" (typically, these accounts were non-intercompany accounts).  If the relevant McCann agencies could not then resolve the discrepancy or disputes in intercompany accounts, McCann should have written the amounts off in a reasonable period of time.

32.    IPG's Standard Policies & Procedures ("SP&P") included a provision for intercompany transactions that applied to all operating agencies, including McCann agencies. The policy required that an intercompany invoice be issued for all amounts exceeding $250 and be recorded by the receiving agency in the month received whether or not the invoice was disputed.  According to the SP&P, the Controller's office was responsible for resolving disputes that the financial or operational staff of the relevant agencies could not.

33.    McCann also required agencies to complete Schedules A and B to confirm intercompany balances.  Schedule A listed an agency's intercompany receivables and Schedule B its payables.

**IPG and McCann Failed to Ensure Intercompany Accounts Were Reconciled**

34.    From at least 1997 through August 2002, McCann's financial management, including its CFO, knew that IPG's intercompany policies were not being followed.

35.    During this period, McCann financial management, including its CFO and EMEA's COO (who at relevant times also handled many aspects of EMEA's Finance Director's responsibilities) knew that intercompany disputes were not being resolved, and intercompany

8

accounts were not being fully reconciled. Moreover, McCann's financial management learned

that certain intercompany receivables would need to be written off, although they did not know

the full extent of the write-off. Despite this awareness, year after year, McCann's financial

management failed to address and resolve these intercompany problems.

36.    During the relevant period, IPG and McCann also failed to devise a system of

adequate internal controls to ensure that intercompany accounts were reconciled on a timely

basis and expensed properly.

37.    Similarly, IPG and McCann also failed to ensure that McCann kept books and

records that accurately and fairly reflected intercompany charges and transactions.

### McCann's Early Awareness of Intercompany Problems

38.    As early as 1997, McCann's financial management knew of general intercompany

problems, which were the most severe within EMEA, and in particular at MEA, due in part to

MEA's role as a European and global coordinator of "club dues" and other expenses. ("Club

dues" are one type of intercompany transaction. It represents costs that were incurred by one

agency when coordinating services for a global client. The agency that incurred such costs

subsequently re-charged a portion to the agencies whose business was enhanced.)

39.    In 1997, MEA's Finance Director met with McCann's CFO and controller and

expressed concerns regarding the lack of a system to handle intercompany disputes.

Additionally, MEA's Finance Director pointed out that intercompany policies were not being

followed. McCann's CFO responded that he was aware of these problems and it was on his

agenda to be resolved.

40.    By 1998, McCann's financial management was aware that intercompany imbalances and disputes in intercompany accounts would result in write-offs.

41.    On or about June 3, 1998, EMEA's outgoing Finance Director sent an email to McCann's deputy controller that stated:  "[I] see as a critical weakness in they (sic) way that our people handle intercompany transactions.  They do not resolve disputes, they are left to stagnate, and the (sic) we have writeoffs."

42.    Additionally, on or about July 30, 1998, a senior financial staffer at EMEA sent an email to European finance directors, copied to EMEA's COO, among others, stating in part that "I believe that we are all in agreement that the level of intercompany invoices now held in dispute has reached an unacceptable level."

43.    The EMEA financial staffer's July 30 email contained a plan to address the intercompany problem, and set a September 18, 1998 deadline for reconciling intercompany accounts.  The email then stated, however, that "it is agreed that any write-offs of a material value not be expensed until January 1999."

44.    In a follow-up email to McCann's controller and deputy controller dated August 6, 1998, the EMEA financial staffer noted "I hope the information you are receiving on differences on intercompany balances will enable you to resolve the outstanding issues.  Hey, what's a $28M discrepancy amongst friends."

45.    McCann's financial management knew that the intercompany imbalance was a growing problem.  On or about September 28, 1998, McCann's deputy controller sent a memorandum to all McCann finance directors, copied to McCann's CFO, stating that "[o]ver the last year intercompany differences have become increasingly material, individually and in the

10

aggregate. In June, as a group, McCann was out an astonishing $40 million. To put this in perspective, IPG as a whole has never had an out of balance that large."

46.    The deputy controller's September 28, 1998 memorandum stated that all disputed items were to be resolved by October 31, 1998.

### McCann Failed to Resolve the Intercompany Problem In 1998

47.    McCann did not resolve its intercompany problems in 1998 at least in part so that McCann could hit its annual profit targets.

48.    EMEA's agencies never completed the intercompany exercise described above because various offices asked for additional time to compile the necessary information, and then agencies had to begin preparing for the annual McCann Forward Planning Meeting. McCann's financial management never ensured that the agencies circled back to complete the intercompany project.

49.    PwC also raised the intercompany issue with McCann's financial management. During the 1997 and 1998 audit years, PwC UK, MEA's external auditors, listed intercompany as a significant internal accounting control weakness. PwC UK qualified its opinion with respect to intercompany balances in its Audit Summary Memorandum concerning MEA.

50.    Additionally, in or around November 1998, PwC US' global audit partner informed IPG's Audit Committee that "[i]ntercompany accounts should be reconciled and confirmed on a timely basis."

### McCann Failed to Resolve the Intercompany Problems in 1999

51.    Throughout 1999, intercompany problems at McCann continued to persist.

52.    In approximately September 1999, EMEA's COO assigned a member of EMEA's

financial staff to investigate the reasons intercompany accounts were not being settled and to resolve the underlying problems.

53.     Despite initiating this project, EMEA's financial staff failed to resolve the intercompany problems.

54.     At this time, EMEA was under pressure to hit increased profit targets.  In 1999, McCann senior management increased EMEA's profit target by 20% from its profit target in 1998.

55.     As a result, in or around August 1999, EMEA's COO sent an e-mail to EMEA agencies' finance directors instructing them to develop a specific plan to reach their targets because EMEA had: "a serious problem ahead of us with reference to achieving our regional profit target for this year." (Emphasis in original).

56.     EMEA's COO and others understood that reconciling intercompany accounts would result in write-offs.  Based on a preliminary analysis, EMEA's financial staff concluded that there were numerous disputes about intercompany invoices that had to be resolved and that resolving theses disputes would create losses that would affect EMEA's profit and loss ("P&L").

57.     EMEA's COO, therefore, postponed the intercompany reconciliation during 1999 so that EMEA would not miss hitting its profit targets.  On or about November 12, 1999, EMEA's COO sent an e-mail to the EMEA staff that stated: "I have chosen January as the date for the [intercompany] meeting as there are likely to be write-offs which I suspect we would want to make next year rather than this."

58.     In or around November 1999, McCann's financial staff was scheduled to attend a Forward Planning Meeting.

59.    Prior to this planning meeting, MEA's Finance Director discussed the intercompany problems with McCann management, including McCann's CFO and EMEA's COO and told them there were significant amounts of unpaid intercompany receivables that were causing MEA's cash position to deteriorate. Members of McCann's financial management told MEA's Finance Director that the intercompany problem would be sorted out.

60.    In October 1999, MEA's Finance Director discussed intercompany problems with IPG's Treasurer. Specifically, MEA's Finance Director told IPG's Treasurer that intercompany balances were not being settled, that there was no process to reconcile intercompany balances, and that intercompany balances had not been reconciled in six years.

61.    When IPG's Treasurer returned to New York, he relayed this information to IPG's CFO.

62.    Throughout 1999, PwC flagged intercompany as one of several areas of risk. PwC UK qualified its opinion on intercompany accounts at MEA in its 1999 MEA Audit Summary Memorandum. PwC UK noted that MEA continued to have difficulties in reconciling intercompany balances due to the volume of affiliates and the age of a number of disputed items.

63.    PwC US also alerted IPG management and its Audit Committee regarding problems with intercompany reconciliations. In its Internal Accounting Controls and Accounting Procedures for the year ended December 31, 1999, PwC US characterized intercompany as one of several priority one risks and stated:

> IPG's intercompany out-of-balance has increased dramatically since year-end and analysis and reconciliations are not performed at each period end to ensure that intercompany accounts are properly stated. We noted that intercompany invoices are not consistently recorded properly and in accordance with IPG policy at the agency level. All agencies must record all invoices when received, regardless of disputed items. However, disputed invoices are often not recorded by agencies

13

and invoices often remain outstanding.  We noticed several intercompany invoices dating back as far as 1989.  In addition, some agencies record the invoices within trade payable and receivable accounts other than intercompany accounts.

64.    PwC US characterized the risk arising from intercompany accounts as "failure to reconcile these amounts could result in misstated account.  Lack of consistency in recording intercompany invoices can lead to an intercompany out-of-balance situation and ultimately result in misstatements to the consolidated financial statements."

<b>McCann Financial Management Continued to Fail to Resolve McCann's<br>Intercompany Problems in 2000- Early 2001</b>

65.    McCann's financial management, including its CFO, continued to fail to address its intercompany problems in 2000, despite receiving further warnings that intercompany problems remained.

66.    For example, MEA's Finance Director resigned his position in early 2000, and described his "frustration" in his resignation letter to MEA's Managing Director stating:

I have highlighted major problems with the intercompany system and implementation of our new computer systems, only to be instructed not to discuss these matters further as they are not issues.  I understand that the intercompany is being reviewed next year, this was tried last year and absolutely nothing happened.

67.    The resignation letter was forwarded to McCann's CFO and EMEA's COO, among others.

68.    Additionally, in or around January 2000, a McCann treasury staff report prepared for McCann's CFO and reviewed in draft form by McCann's controller, noted the existence of "[m]any outstanding intercompany invoices (both receivable and payable) are several years old – most notably between London and New York .... It appears likely that many of these accounts

14

will not be settled in full ... yet a reserve has not been established against which to eventually write them off."

69.    In late January or early February of 2000, an EMEA financial staff member reported on his project to identify EMEA's intercompany exposures to EMEA's COO and McCann's controller. The staff member estimated that the aggregate exposure over the years reviewed may be as high as $20-30 million.

70.    In late March 2000, EMEA's COO and members of EMEA's financial staff corresponded by e-mail with McCann's controller that the next step would be "agree with [McCann's controller on] the accounting treatment of these write offs."

71.    However, questions quickly surfaced concerning the thoroughness and accuracy of the EMEA's financial staff member's report.

72.    In early 2000, McCann hired a new Finance Director for EMEA.

73.    EMEA's new Finance Director learned of the EMEA's financial staff's intercompany project. After reviewing the work that had been done, the new Finance Director immediately concluded the intercompany project was inadequate and that a proper intercompany reconciliation required collecting all Schedules A and B which reflected each offices' individual intercompany receivables and payables, and that the EMEA financial staff had not done this.

74.    The EMEA Finance Director then initiated his own exercise to quantify intercompany exposures.

75.    Subsequently, the EMEA Finance Director warned EMEA's COO and McCann's controller that his staff did not receive the required schedules from markets to prepare the reconciliations. On or about June 15, 2000, EMEA's Finance Director sent an e-mail to EMEA's

COO and McCann's controller that stated:

> for the last month we here in europe hq have been working on reconciling the intercompany. We have made progress but still having difficulty getting local schedules to tie into schedules submitted to ny and do not have schedules of any kind from some offices. Care to guess the last time the intercompany was actually reconciled? Care to guess what we are finding so far? Should I ask why schedules A and B are not reconciled to balance sheets in ny on a quarterly/annual basis.

76.    EMEA's COO responded "We have been dancing around this subject for years. Nobody want[ed] to address it."

77.    By the end of August 2000, EMEA's Finance Director still had been unable to complete the intercompany reconciliation project.

78.    In 2000 and 2001, McCann's unwillingness to reconcile its intercompany accounts and address intercompany exposures continued to be attributable to the pressure to hit profit targets.

79.    In or around March 2000, EMEA's COO directed that EMEA should delay sending out intercompany disputes for resolution while new stretch targets for profits were being sent to those agencies because this would increase the amount of profitability the agency had to deliver because they would have to cover any write-offs associated with intercompany adjustments.

80.    In or around July 2000, concerned that EMEA would fail to reach profit targets, EMEA's COO wrote to EMEA's finance directors that:

> Overall, the message is that we <u>have</u> to make the stretch goal. <u>We</u> will be held responsible if we do not. ... Put simply, the stretch goal is not a "goal", it is a <u>mandate</u> and we are the people who make it ... by whatever means we can dream up! (emphasis in original).

81.     EMEA's COO discussed with McCann's CFO the proposed timing of write-offs and his concerns that intercompany write-offs would affect his ability to deliver on the profit target in the EMEA region.

82.     In November 2000, EMEA's COO, in an e-mail that summarized his conversations with McCann's CFO, directed that intercompany write-offs be taken in 2001 rather than in 2000:

> we want to implement this exercise at a time when people will have time to pick up any itnercompany (sic) costs that are 'in dispute' and the best time to do this is not now but rather at the beginning of 2001 (you will remember that we planned to do this in the 1st quarter in 2000 to leave the rest of the year for people to make up any shortfalls resulting from this exercise).

83.     McCann financial management continued to be aware of the intercompany problem and they expressed concerns about intercompany related write-offs in 2001.

84.     On February 12, 2001, EMEA's COO e-mailed EMEA's controller (and others) and indicated that McCann's CFO wanted to hold a meeting to analyze intercompany exposures and that:

> to the extent we can afford it, to book them in the same quarter . . . we cannot afford heavy write offs this year with reference to the intercompany problem. This is something we are going to have to 'manage' as, against my and [McCann's controller's] wishes, our target for Europe profit this year has been increased from our original submission.

85.     Moreover, in early 2001, McCann's Controller discussed with McCann's CFO an intercompany reconciliation plan that his deputy proposed.  This plan included recording older intercompany exposures as non-operating expenses.

86.     According to McCann's controller, McCann's CFO rejected the proposal because he wanted to first get a better understanding of the issue at hand, and the exposures themselves,

and he did not agree with the treatment the controller's office was proposing.

87.    McCann's CFO did not specify what additional information he needed and did not instruct his controller to conduct the exercise differently. This intercompany project, like the earlier projects, was simply never completed.

88.    PwC continued to flag intercompany issues in 2000. For example, PwC US' 2000 Audit Plan provided to IPG's Audit Committee identified intercompany activity as one of several "area[s] of higher risk" and noted that intercompany activity would be an area of audit focus for the year.

89.    Similarly, as in previous years, PwC UK, in its Audit Summary Memorandum, concluded that it was unable to state an opinion whether MEA intercompany balances were fairly stated.

90.    During the 2000 year end closing for MEA, PwC UK auditors discussed with McCann's controller that the intercompany reconciliation remained in a "poor state."

91.    PwC UK's Audit Summary Memorandum also flagged a significant £11 million intercompany in –transit entry in the "AR-Other" account and noted that intercompany balances in that account should be reclassified.

### IPG's 2001 Restructuring and Other Asset Write-Off

92.    During the second and third quarters of 2001, faced with a sharp downturn in the advertising market and problems arising from a recent significant acquisition, IPG initiated a restructuring exercise that led IPG to record a total charge of $645.6 million in the third quarter of 2001 ("Restructuring"). The Restructuring focused on write-offs primarily associated with severance costs, headcount reductions, and real estate lease terminations.

18

93.     Additionally, IPG wrote off $85.4 million of various unrealizable assets in the third quarter of 2001 ("Other Asset Write-Off").

94.     During the planning for the Restructuring and Other Asset Write-off in or around May 2001, IPG requested that its subsidiaries, including McCann, provide information on all balance sheet exposures so that the company could address them as part of this exercise.

95.     In anticipation of this exercise, McCann agencies submitted information on intercompany exposures. For example, on or about May 22, 2001, McCann's controller requested that McCann worldwide financial staff complete a template for certain balance sheet accounts, including amounts identified as "A/R Other Intercompany In-Transit" and "A/R Other Intercompany In Dispute."

96.     In response to these requests, on or about June 4, 2001, EMEA's controller submitted to McCann's controller a schedule that showed $42 million in intercompany exposures for periods prior to January 1, 2000.

97.     In approximately May or June 2001, IPG executives, including IPG's CFO and the Head of IPG's Internal Audit, met with McCann's financial management, including McCann's CFO and McCann's controller.

98.     During these meetings, McCann's CFO and McCann's controller produced schedules that showed an approximately $20-$30 million aggregate intercompany write-off for McCann over the years reviewed.

99.     IPG's CFO and Head of Internal Audit reviewed these schedules and referred to McCann's write-off submission as a "wish list" or "Christmas in July." IPG's CFO and Head of Internal Audit felt that McCann wanted to write-off assets without having to do any work and to

get relief and a free ride in terms of recovery of assets that they didn't know whether they were impaired or not.

100.    IPG's CFO, after discussion with PwC US, then determined that the Restructuring would not include intercompany exposures because these exposures reflected operating expenses that were not appropriate for restructuring under General Accepted Accounting Principles ("GAAP").

101.    Further, IPG's CFO and Head of Internal Audit told McCann's CFO and controller that McCann needed further detailed support to show that intercompany assets were impaired and should be written off as part of the Other Asset Write-Off.

102.    Despite knowledge of this potential exposure, neither McCann's CFO nor McCann's controller provided the additional information to IPG in 2001, nor did they set any reserves or write-off these amounts.

### A "Fundamental Breakdown of Internal Controls" at McCann

103.    Due to the magnitude of write-offs at McCann in the Restructuring and Other Asset Write-off, during August and September 2001, IPG internal audit and PwC embarked on an extensive review of balance sheet exposures at McCann, with a particular focus on EMEA.

104.    PwC then expressed concerns about the exposures and related internal controls within McCann directly to the IPG Audit Committee. PwC US' worldwide engagement partner circulated a document to the Audit Committee at its October 11, 2001 meeting entitled "Opportunities to Enhance The Company's Internal Control Framework." The document stated:

> [t]he extent of full scope external audits has only been increased incrementally in line with the continued growth of IPG based upon an assessment that the control environment was sufficient to support the level of growth experienced. Recent

events, however, have revealed a fundamental breakdown of internal controls at a minimum of two operating groups. [One of which was McCann.] (emphasis added).

105.    PwC US' worldwide engagement partner later described one of the internal control weaknesses as a lack of timely reconciliation of inter and intra company activities.

106.    Following additional discussions, IPG's CFO and Head of Internal Audit assured PwC that remedial measures, including new financial staff and improved intercompany reconciliation processes, were being implemented to fully address any internal control issues.

107.    In the Fall of 2001, IPG and McCann removed McCann's controller and transferred him to another function within IPG's headquarters.

108.    During his job transition in or around September 2001, McCann's outgoing controller met with IPG's CFO and Head of Internal Audit and proposed a $30 million reserve for intercompany exposures.

109.    Other McCann executives, including McCann's CFO and McCann's new controller, generally agreed with this proposal to set reserves, despite the fact a thorough intercompany reconciliation still had not been performed.

110.    IPG's CFO, after discussions with PwC, believed, however, that the reserve request lacked detailed support and therefore could not be taken.

111.    During late 2001 and early 2002, PwC UK continued to express concerns that intercompany transactions were improperly recorded.

112.    As in previous years, for the year ended December 31, 2001, PwC UK qualified its opinion regarding MEA's intercompany accounts in its Audit Summary Memorandum.  PwC UK's Audit Summary Memorandum also commented on intercompany amounts included in the

"AR-Other" account, in addition to approximately $22 million of club dues that were recorded in an "AR-Current" account instead of intercompany accounts.

### IPG and McCann Finally Resolve Intercompany Issues

113.    In 2002, IPG's Audit Committee summoned McCann's CFO to appear at its meeting in April and directed that all IPG subsidiaries reconcile their intercompany accounts by September 30, 2002.

114.    As a result of this directive, on or about May 3, 2002, McCann's new Controller announced that agencies had to reconcile all intercompany amounts by September 30, 2002.

115.    The May 3 announcement also provided that agencies who did not eliminate their intercompany out-of-balance by June 30, 2002 would be charged 10% of that amount, which would affect operating incentive amounts.

116.    In approximately late July 2002, EMEA claimed to have discovered that many receivables were aged and not collectible, and therefore required write-offs.

117.    During early August, IPG and PwC attempted to quantify exposures.

118.    On August 13, 2002, IPG announced that it would restate its financial statements for the periods 1997 to March 31, 2002, because it found a total of $68.5 million of charges, primarily in Europe, which had not been properly expensed over those years.  Approximately $58 million of its proposed $68.5 million restatement was due to improperly expensed charges for intercompany activity within EMEA.

119.    On October 16, 2002, IPG issued a press release indicating that it had identified an additional $50 million charge that had to be restated.  Approximately $40 million of these additional charges reflected intercompany transactions within EMEA, including charges for club

22

dues that needed to be written-off.

120.    On November 13, 2002, IPG issued a press release announcing that it would

restate an additional $60 million of charges in its restatement and that the final amount to be

restated would be $181.3 million for the period 1997 through the quarter ended June 30, 2002.

121.    In total, $101 million of the $181 million related to intercompany transactions,

and approximately 71% of the intercompany charge was attributable to MEA and EMEA.


### Reason for Intercompany Misstatements – The Drive for Profits

122.    Shortly before the restatement announcements, McCann officials drafted various

documents that attempted to explain the cause of the intercompany problems.  For example, in

June 2002, EMEA's Managing Director requested that EMEA's COO, who by this time had

been promoted to Deputy Director, draft an e-mail to explain how EMEA would not be able to

reach its target if certain items were expensed and that EMEA should not be penalized for these

write-offs.

123.    EMEA's Deputy Director drafted this document, which EMEA's Managing

Director sent on or about June 5, 2002.  In the intercompany section, the e-mail stated:

> In common with other McCann regions, there are a large number of intercompany
> accounts in EMEA that have not been reconciled for at least 10 years.  This is
> something that has built up over a long period of time.  It has nothing to do with
> our performance this year and quite frankly, is something that should have been
> cleared up a long time ago.  As you know, it wasn't addressed earlier because of
> its potential firstly, to expose sensitive issues like the Russia problem and
> secondly, to undermine the profit imperative that required EMEA to use any
> reserves it may have had to help deliver the 20-30% annual profit growth that we
> have produced for the last several years.

124.    On or about August 9, 2002, EMEA's controller faxed a memorandum to

EMEA's Managing Director describing the reasons for the intercompany problems at EMEA. The memorandum stated: "Throughout the late 1990's and into 2000, the ME system and Europe in particular did not address intercompany issues, partly due to a lack of cash in the region (there was little clear down of items) but more specifically due to the P&L impact."

125.    Finally, McCann's controller, in his handwritten notes regarding intercompany taken on or about July 29, 2002, wrote: "Drive for Profits!! Caused this."

**IPG Continued to Fail to Resolve Its Financial Reporting Problems**

**IPG Again Restated Financial Results in 2005**

126.    IPG did not address or correct all of its financial reporting problems in 2002.

127.    In September 2005, IPG once again restated its financial results. IPG restated its pre-tax income in the amount of $420 million for the years 2000 through 2003 and the nine months ended September 2004. The 2005 restatement included numerous issues, and highlighted the continued lack of adequate internal controls throughout IPG's agencies.

**IPG Improperly Recognized Revenue from AVBs**

128.    A large portion of the restatement related to $199 million of improperly recognized revenue because IPG had failed to comply with contracts that required IPG agencies to pass AVBs and other credits and discounts provided by the media outlets to certain clients. Instead, regional and local agencies retained the AVBs and recorded them as revenues.

129.    AVBs are discounts or rebates given by media providers to advertising agencies for meeting certain objectives, such as total volume of business placed with the media providers for that year. AVBs do not exist in the United States, but are given by media providers in much

24

of the rest of the world.

130.    Certain countries regulate AVBs, but for the majority of countries, whether an agency retains AVBs is a contractual matter between the agency and its client.

131.    Over the last decade, the advertising industry has faced client pressure to move from commission-based compensation to fee-based arrangements.  As part of this trend, multinational clients increasingly requested from IPG and its agencies contractual clauses requiring the return of AVBs.

132.    Multinational client contracts were often negotiated at IPG's or McCann's Worldgroup level.

133.    In some markets, however, local agencies and their local client counterparts negotiated, either in writing or orally, contractual terms providing that the local agency could retain AVBs, sometimes in exchange for the client paying a lower commission or fee rate.  (In certain markets, AVBs were a significant source of revenues.)  These agreements conflicted with the global contracts, often unbeknownst to the local agency and the Worldgroup level employees.

134.    Since at least 2000, IPG and its agencies incorrectly recorded revenue attributable to AVBs that should have been returned to certain of their clients under the applicable contracts.

135.    While there were certain incidents of agencies attempting to hide the fact that they were retaining AVBs from their clients, in most cases the error was attributable to lack of internal controls.

136.    For example, IPG had no central repository for client contracts, and no mechanism to ensure that global contracts were being complied with.  Furthermore, IPG had no

system in place to ensure that contracts entered into at the regional or local level were consistent with contracts entered into at the Worldgroup level.

137.    Additionally, in some instances, the contracts simply contained ambiguous language.

**IPG's Inadequate Internal Controls Enabled Other Problematic Financial Practices**

138.    The most significant remaining components of the 2005 restatement reflected internal control issues relating to IPG's numerous acquisitions.

139.    IPG had to restate $34.8 million net of tax because its agencies had improperly recorded earnings (and revenue) from acquired businesses from a point in time that was prior to the closing date of the acquisitions, or the time when IPG had obtained effective control of the entity.

140.    Under GAAP, revenue and income of acquired companies should be recorded in the acquirer's financial statements after the acquisition date, or the date the acquirer has obtained effective control.

141.    The 2005 restatement also reduced earnings by $70.4 million net of taxes for contingent consideration paid to owners of acquired businesses that were accounted for as goodwill when these payments should have been accounted for as compensation costs.

142.    For example, when IPG or its operating agencies acquired companies, the acquisition agreements would often include earn-out clauses that would provide contingent consideration over several years for the acquired company's shareholders, who were executives or employees. These earn-out payments were contingent on the acquired company's future financial performance. In addition, these payments were often contingent on the selling

26

shareholders' continued employment.

143.   In other acquisitions where IPG purchased only a portion of the business, IPG negotiated put and call options to acquire additional equity. In some instances the put options were contingent upon the future employment of key personnel.

144.   Under GAAP, IPG should have recorded the earn-out payments and put payments as compensation expense when they were contingent upon the employment of the shareholders or key personnel. IPG, however, often recorded the payment as consideration for the acquisition and thus, capitalized it as an asset, i.e. goodwill.

145.   While IPG attempted to address this error in 2004, its internal controls were not even sufficient to identify all of the contractual arrangements that its agencies had with owners of businesses it acquired.

146.   Finally, as part of the 2005 restatement, IPG also took write-offs related to internal investigations of possible employee malfeasance, accounting for international compensation agreements and lease accounting.

**D.      IPG Made Numerous Misstatements in its Public Filings**

147.   IPG filed numerous Forms 10-K, Forms 10-Q, and Forms 8-K that contained misrepresentations due to the intercompany issues, the AVB issues, and the various other issues that were reflected in the 2002 and 2005 restatements. Specifically, IPG misstated its earnings in its December 31, 1997 Form 10-K, December 31, 1998 Form 10-K, December 31, 1999 Form 10-K, December 31, 2000 Form 10-K, December 31, 2001 Form 10-K, December 31, 2002 Form 10-K, and December 31, 2003 Form 10-K, as well as Forms 10-Q and Forms 8-K during this period. For example, as reflected in IPG's public filings, net income was overstated by $85.7

million or 31% in the year ended December 31, 2000 and $82.8 million or 496% in the year

ended December 31, 2002. IPG's net loss was understated by $98 million or 16% in 2001 and

$87.4 million or 16% in 2003. Precise misstatement information for the years 1999 and earlier is

not available because the 2005 restatement did not give the year by year impact of the

cumulative restatement total for those years of $137.7 million. However, net income for the

years 1999 and 1998 were overstated by $19.2 million (6%) and $12.4 million (4%) due to the

2002 restatement alone.

148.    While IPG was inaccurately reporting its financial results, IPG conducted various

securities offerings. For example, in connection with an August 22, 2001 offering of unsecured

notes, IPG filed a Form S-4. Additionally, on October 20, 2000, IPG issued senior unsecured

notes and filed a Form S-3.

### FIRST CLAIM FOR RELIEF

**IPG Violated Sections 17(a)(2) and (3)**
**of the Securities Act**

149.    The Commission repeats and realleges each and every allegation contained in

paragraphs 1 through 125, as if fully set forth herein.

150.    Section 17(a)(2) and (3) prohibits directly or indirectly any person, in the offer or

sale of securities, by the use of the means and instruments of transportation and communication

in interstate commerce or by use of the mails: (a) to obtain money or property by means of or

otherwise make untrue statements of material facts or omit to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made,

not misleading; and (b) to engage in transactions, practices or courses of business which operate

28

or would operate as a fraud or deceit upon purchasers of securities.

151.    As part of, and in furtherance of the violative conduct, in connection with
intercompany transactions, IPG negligently made material misrepresentations about its financial
results in periodic filings, and failed to disclose material information, to investors in IPG.

152.    By reason of the conduct described above, IPG violated, and unless enjoined will
violate again, Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3).

### SECOND CLAIM FOR RELIEF

**McCann Violated Section 17(a) of the Securities Act**
**and Section 10(b) of the Exchange Act**
**and Rule 10b-5**

153.    The Commission repeats and realleges each and every allegation contained in
paragraphs 1 through 125 as if fully set forth herein.

154.    McCann, directly or indirectly, in the offer or sale, and in connection with the
purchase or sale of securities, by the use of the means and instruments of transportation or
communication in interstate commerce, or by use of the mails: (a) employed devices, schemes
and artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue
statements of material facts or omitted to state material facts necessary in order to make the
statements made, in light of the circumstances under which they were made, not misleading; and
(c) engaged in transactions, practices or courses of business which operated or would operate as
a fraud or deceit upon purchasers of securities.

155.    As part of, and in furtherance of the violative conduct, McCann made material
misrepresentations, and failed to disclose material information about its intercompany
transactions in its financial statements, and McCann knew this information would be

29

consolidated into IPG's financial results.

156.    McCann acted recklessly.

157.    By reason of the conduct described above, McCann violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF
### IPG Violated
### the Reporting Provisions of the Exchange Act
### (Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder)

158.    The Commission realleges and incorporates paragraphs 1 through 148 by reference as if fully set forth herein.

159.    IPG, whose securities are registered pursuant to Section 12 of the Exchange Act, failed to file annual, quarterly and current reports with the Commission that were true and correct, and failed to include material information in its required statements and reports as was necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

160.    IPG materially misstated its financial results due to a number of factors, including its failure to account properly for intercompany transactions, AVBs, and certain acquisitions.

161.    By reason of the conduct described above, IPG violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11 and 13a-13, 17 C.F.R. §§240.12b-20, 13a-1, 13a-11 and 13a-13, thereunder.

## FOURTH CLAIM FOR RELIEF
### McCann Aided and Abetted IPG's Violations
### of the Reporting Provisions of the Exchange Act
### (Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13
### thereunder)

162.    The Commission realleges and incorporates paragraphs 1 through 148 by
reference as if fully set forth herein.

163.    McCann knowingly provided substantial assistance to IPG in the commission of
some or all of the violations by IPG of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a),
and Rules 12b-20, 13a-1, 13a-11 and 13a-13, 17 C.F.R. §§240.12b-20, 13a-1, 13a-11 and 13a-
13, thereunder.

164.    For example, McCann failed to properly account for its intercompany
transactions, and because IPG issued consolidated financial results for its subsidiaries, including
McCann, IPG's financial statements were inaccurate.

165.    By reason of the conduct described above, McCann, pursuant to Section 20(e) of
the Exchange Act, 15 U.S.C. § 78t(e), aided and abetted, and unless enjoined will again aid and
abet, IPG's violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-
20, 13a-1, 13a-11 and 13a-13, 17 C.F.R. §§240.12b-20, 13a-1, 13a-11 and 13a-13, thereunder.

## FIFTH CLAIM FOR RELIEF
### IPG Violated the
### Books and Records and Internal Control Provisions of the Exchange Act
### (Section 13(b)(2)(A) and (B) of the Exchange Act)

166.    The Commission realleges and incorporates paragraphs 1 through 148 by
reference as if fully set forth herein.

167.    From at least 1997 through 2005, IPG failed to make and keep books, records,

31

and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

168.    From at least 1997 through 2005,  IPG failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances, to record transactions, maintain accountability of its assets, and permit financial statements to be prepared in conformity with GAAP.

169.    By reason of the conduct described above, IPG violated, and unless enjoined, will again violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A) and (B).

## SIXTH CLAIM FOR RELIEF
### McCann Aided and Abetted IPG's Violations of the
### Books and Records and Internal Control Provisions of the Exchange Act
### (Section 13(b)(2)(A) and (B) of the Exchange Act)

170.    The Commission realleges and incorporates paragraphs 1 through 148 by reference as if fully set forth herein.

171.    McCann knowingly provided substantial assistance to IPG in the commission of some or all of the violations by IPG of Sections 13(b)(2)(A) and (B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A) and (B).

172.    From January 1997 to November 2002, McCann failed to maintain adequate internal controls and books and records to enable it to accurately report intercompany transactions.

173.    By reason of the conduct described above, McCann, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), aided and abetted, and unless enjoined will again aid and

abet, IPG's violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A) and (B).

## **PRAYER FOR RELIEF**

**WHEREFORE,** The Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining IPG, its agents, officers, servants, employees, attorneys, assigns and all those persons in active concert or participations with them, who receive actual notice of the Judgment by personal service or otherwise, and each of them from violating Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3), and Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (B), and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder, 17 C.F.R. §§240.12b-20, 13a-1, 13a-11 and 13a-13.

### II.

Permanently restraining and enjoining McCann, its agents, officers, servants, employees, attorneys, assigns and all those persons in active concert or participations with them, who receive actual notice of the Judgment by personal service or otherwise, and each of them from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act,15 U.S.C. §§78m(a) and 78m(b)(2)(A) and (B), and Rules 12b-20, 13a-1, 13a-11, 13a-13, 17 C.F.R. §§240.12b-20, 13a-1, 13a-11 and 13a-13.

## III.

Ordering IPG and McCann to disgorge all ill-gotten gains, derived directly or indirectly, from their violative conduct alleged herein and to pay prejudgment interest thereon.

## IV.

Ordering McCann to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. §78u(d)(3); and

## V.

Granting such other relief as this Court may deem just and proper.

Dated: April 30, 2008

      New York, New York

                    Respectfully submitted,

                    Mark K. Schonfeld (MS-2798)
                    Attorney for Plaintiff
                    SECURITIES AND EXCHANGE COMMISSION
                    New York Regional Office
                    3 World Financial Center, Room 4300
                    New York, NY 10281
                    (212) 336-0068 (William Finkel)
                    (212) 336-1320 (fax)

Of Counsel:
Kay L. Lackey (Not admitted in New York)
Robert H. Murphy
William Finkel
Amelia Cottrell